UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM DUCLOS,              )
        Petitioner,          )
                             )
                             )
v.                           )
                             )
                             )
LUIS SPENCER,                )
        Respondent.          )

PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL

Now comes the petitioner, William Duclos, acting pro-se in the above-referenced matter and respectfully request that that this honorable court appoint counsel to represent the petitioner in the instant action.

As grounds for this motion the petitioner states that he is untrained in the law and proceeding with the assistance of an inmate law clerk. Further, the petitioner was represented by appointed counsel throughout his entire state court post-conviction proceedings. See Attachment 1.

Counsel, Chauncey B. Wood, found merit in the petitioner's claims and forwarded his findings to Don Bronstein of the Committee for Public Counsel Services, who inturn agreed with Mr. Woods findings and appointed him. Attachment 1.

WHEREFORE, the petitioner respectfully prays that this honorable court appoint counsel to represent him in these proceedings to ensure that his claims are adequately presented to this court

Date: June 13, 2005                Respectfully submitted,

                                   *William Duclos*
                                   William Duclos
                                   P.O. Box 43
                                   Norfolk, MA   02056

**MEMORANDUM**

To:     Don Bronstein, Committee for Public Counsel Services
        Denise Simonini, Committee for Public Counsel Services

cc:     William Duclos

From:   Chauncey B. Wood

Re:     Potential Grounds for Withdrawal of Guilty Plea by William Duclos

Date:   May 17, 2000

---

The Committee for Public Counsel Services (CPCS) has asked me to investigate potential grounds for William Duclos' withdrawal of his guilty plea to second degree murder.

I considered three primary grounds for challenging Mr. Duclos' guilty plea. First, I considered the possibility of arguing that his trial counsel was ineffective in failing to move to suppress Mr. Duclos' confession to the police. Second, I considered the possibility of arguing that the plea was not knowing and intelligent because neither the Court nor counsel explained the concept of malice - an element of second degree murder - during the plea colloquy. Finally, I considered the adequacy of the colloquy as a whole. Ultimately, I think the only possible grounds for withdrawal of the guilty plea is a claim that counsel was ineffective in not moving to suppress Mr. Duclos' confession.

I.      Facts

In the Spring of 1989, William Duclos, who was nineteen years old, was living with his parents Anna and Emile Duclos in Winchendon, Massachusetts. Apparently, William and his mother had a long-standing feud about a number of things including money. More specifically, when a family barn burned down, the family collected insurance money. William repaired the barn, but Anna refused to give him any of the insurance money to pay for the repairs. Anna was also upset that William had recently bought his girlfriend a diamond engagement ring and that he spent so much time with his best friend John Smith, who she considered a bad influence on William. John also held a grudge against Anna Duclos. He had once expressed a desire to kill his own mother and had attempted to take a gun from the Duclos house to do it. Anna Duclos stopped him and then told his mother about his intentions. This angered John.

On May 22, 1989, William and John spent the morning repairing a fence. That morning they devised a plan to kill William's parents. They agreed to shoot William's parents that night in their home and make it appear that they had been killed in a robbery.

That evening, William picked up John at his home and they drove to William's house. William went inside and retrieved two rifles. William and John give different versions of what happened next. William claims that he signaled John to come inside and John did so. William handed one of the rifles to John and they climbed the stairs toward Anna's and Emile's bedroom. As they climbed, the stairs creaked and Anna called out "What's wrong?" William responded "nothing." John then pushed past William and fired into the bedroom, but missed. He fired a second shot that struck Anna. He fired a third shot that struck Emile. John then took the rifle from William and fired once more into each body at point blank range, killing both of them.

John Smith claimed, by contrast, that William went inside and never signaled for him to come inside. Rather, after approximately an hour, John heard a shot fired inside the house and ran inside. He yelled to William who eventually let him in the side door. William told John to start opening drawers and start throwing stuff on the ground. William told John that he had shot both of his parents. John denied ever going upstairs himself.

In either event, William and John both claimed that they took Anna's purse and Emile's wallet and went to a local pond where they disposed of these items along with the rifles, and William's clothing. Afterwards, William dropped John off and returned home.

William then went to the home of his grandmother Lillian Greulich, who lived next door. He reported that his parents had been shot and it appeared as though the house had been burglarized. At 11:45 p.m., Lillian called the police, who arrived a few minutes later. At the scene, Winchendon police officer Richard Marinelli interviewed William briefly. William stated that he came home at approximately 11:00 p.m. and found the living room in disarray. He called out his parents names but they did not reply. He then claimed he went upstairs, found their bodies, and ran out of the house, got in his truck and drove to his grandmother's house.

At 1:55 a.m., a state trooper and a Winchendon police officer took William to the Winchendon Police Department for an in depth interview. William claims that he was not given a choice whether to go or not. Rather, the trooper essentially ordered him to go to the station. State Police Sergeant Brad Mullen, Winchendon Police Chief Charles Leavens, and Winchendon officer Michael Young questioned William. They asked him what had happened and he repeated the story he had told to Officer Marinelli. According to Chief Leavens' report, the three officers then told William that they did not believe his story about finding his parents shot. The police asked William to remove his sneakers and socks so they (the police) could examine them for blood. When William did so, the police noticed blood stains on his white socks. The police questioned him about these stains and he did not respond immediately. Chief Leavens reports that he began shivering and got visibly nervous. William claims he then stated that he must have gotten blood on the socks when he walked upstairs and found his parents. This statement obviously would have been false because the blood was spattered on the top portions of the socks, not the bottom. Sergeant Mullen's report indicates that he then expressed doubts about William's explanation. According to Chief Leavens' report, William then asked to speak "off the record." Chief Leavens said "nothing is off the record." William then asked to speak to Sergeant

Mullen alone. Chief Leavens and Officer Young then left the room. According to Sergeant Mullen, at 3:45 a.m. - after Chief Leavens and Officer Young had left the room - he read the Miranda warnings to William for the first time, after which William signed a Miranda waiver form and disclosed that he and John had plotted to kill his parents and that John had actually shot them. William claims, by contrast, that Sergeant Mullen did not read the Miranda warning to him and that he did not sign the Miranda waiver until after he had confessed. Sergeant Mullen's version of events is undermined by the fact that the Miranda waiver card indicates that William's signature was witnessed by Officer Young. In other words, if Officer Young really left the room before Sergeant Mullen read the Miranda warnings, before William signed the Miranda waiver card, and before William confessed (as Sergeant Mullen indicated in his report), if Officer Young did not return to the interrogation room until after William confessed (as both Sergeant Mullen and Chief Leavens indicated in their reports), and if Officer Young really witnessed William's signature on the Miranda waiver card (as the Miranda waiver card indicates), the record would seem to support the claim that William did not sign the Miranda waiver card until after he confessed. I expect that if we raise this issue, Sergeant Mullen will claim that he read the Miranda warnings to William before he confessed. Furthermore, he will claim that William signed the Miranda waiver card before he confessed and Officer Young signed it after he confessed, once he confirmed that William had in fact signed it.

After William confessed, he was placed under arrest for the murder of his parents. William then agreed to cooperate fully in the investigation of the crime. Later that morning, he took police investigators to the pond where he and John had disposed of the clothing, purse, wallet and rifles, and the police dive unit retrieved those items.

At 6:05 a.m., the police interviewed John Smith at the Winchendon Police Department. They first asked him where he had been the previous night and he told them that he had been out with William from 9:00 p.m. to 11:00 p.m. when William had dropped him off at home. The police then told John that Anna Duclos had been shot. They then read the Miranda warnings. At 6:17 a.m., John confessed to being involved. John was then placed under arrest and charged with the murder of Anna and Emile Duclos.

After his arraignment, John Smith's attorney filed a Motion to Suppress his confession, claiming that the police had read him the Miranda warnings only after eliciting an incriminating false alibi, thereby encouraging him to confess. The motion judge denied the motion and John proceeded to trial. When he learned that John's attorney had filed a motion to suppress, William claims he asked his attorney, Louis Aloise, why he was not filing a motion to suppress. William claims that his attorney said that filing a motion would be pointless. He would lose because his version of events was contradicted by Sergeant Mullen's report (i.e. Mullen read the Miranda warnings before William confessed). William claims that the decision not to file the motion to suppress was not based on tactical considerations because the Commonwealth had offered a plea to 2nd degree murder long before John's trial. Furthermore, he claims that Attorney Aloise urged him to testify against John Smith, and he refused to do so.

Ultimately, however, William did testify against John. William claims that he decided to testify for the prosecution because his grandmother begged him to do so. He claims that in the midst of trial, the prosecutor orchestrated a meeting between him and his grandmother in the courthouse. At that meeting, Lillian told William that if he did not testify, John would go free and she was afraid he would attack her. She also said the prosecutor had promised that if William testified, he would be placed in M.C.I. Gardner where he would be close to her. After William testified, John was convicted of 1st Degree murder. John appealed his conviction and the SJC reversed on the ground that his confession should have been suppressed. See Commonwealth v. Smith, 412 Mass. 823 (1992). John then pled guilty to manslaughter and served a sentence of 11 and a half years. In the meantime, after John's trial, William pled guilty to 2nd Degree Murder on July 26, 1990.

II.   Legal Argument

  A.   William Duclos' Confession

I have considered the possibility of raising a claim that William Duclos' trial counsel was ineffective in not pursuing a motion to suppress his confession.

First, it seems clear that William's confession could not have been suppressed on the same grounds as John Smith's confession. The crucial distinction between the two is that the police knew John Smith was a suspect as soon as they began questioning him, because William had told them that John had shot his parents. Thus, by eliciting an alibi they knew to be false, they opened themselves to a "cat-out-of-the-bag" argument. See Smith, 412 Mass. at 829-37. When the police began questioning William, by contrast, they had no apparent reason to believe that he was a suspect. Thus, their questioning at that point seems to have been "general questioning of citizens in the fact-finding process" rather than "interrogation." Miranda v. Arizona, 384 U.S. 436, 477 (1966); see also Commonwealth v. Doyle, 12 Mass. App. Ct. 786, 792-93 (1981). Furthermore, they had no reason to believe his alibi was false. Their suspicion seems to have focused on him for the first time when they noticed blood stains on his socks.

Obviously, if William is to be believed, and Sergeant Mullen really read the Miranda warnings to him after he confessed, his confession should have been suppressed. While there was certainly ample reason to be skeptical of William's version of events, the inconsistencies outlined above between Sergeant Mullen's report, Chief Leavens' report and the Miranda waiver card, provided a good faith basis for filing the motion. In any event, I believe there was little to lose by filing such a motion. I find it hard to imagine that the Commonwealth would have refused to recommend 2nd degree murder simply because William moved to suppress his confession. If he lost the motion, he could still have offered to testify for the Commonwealth against John Smith in exchange for the Commonwealth's recommendation of a plea to 2nd degree murder. In fact, I find it hard to believe that the Commonwealth would not have accepted a plea to 2nd degree murder simply to avoid the trouble of trying William's case.

4

Alternatively, the police request that William remove his shoes might be considered an unjustified warrantless search of his person, meaning that the discovery of the blood-soaked socks, the confession and the subsequent cooperation were all fruit of the poisonous tree. The Commonwealth would certainly argue that William consented to the removal of his shoes and that as a result, he gave up any expectation of privacy in his socks by exposing them to the plain view of the officers. In response, one might argue that William could not voluntarily consent to remove his shoes, given that he was a 19 years old high school drop out, it was approximately 3:30 a.m. and he was surrounded by three experienced police officers investigating a double murder in the Winchendon Police Station. The Commonwealth will probably also argue that the confession was not a fruit of the discovery of the blood-stained socks. In other words, the discovery of blood on William's socks did not prove that he was guilty or lead inevitably to his confession. The response must be that William would not have confessed but for the discovery of blood on his socks.

Any challenge to the admissibility of William's confession would be undermined by the fact that he cooperated fully with the police after he confessed. He led them to the pond where he disposed of the evidence and he testified against John Smith at Mr. Smith's trial. The Commonwealth will no doubt argue that all of this information would have been independently admissible against William. The response must be that everything that occurred after the discovery of the blood stained socks was fruit of the poisonous tree and thus inadmissible. Alternatively, we could argue that all of the cooperation was inadmissible under a "cat-out-of-the-bag" analysis.

While a guilty plea generally waives all but jurisdictional defects in the proceedings prior to the entry of the plea, see Commonwealth v. Fanelli, 412 Mass. 497, 500 (1992), claims based on ineffective assistance of counsel are not waived by a guilty plea. See Commonwealth v. Perry, 389 Mass. 464 (1983); Commonwealth v. Chetwynde, 31 Mass. App. Ct. 8 (1991); Commonwealth v. Cepulonis, 9 Mass. App. Ct. 302, 304-08 (1980). A guilty plea may be withdrawn where it is the result of "serious incompetency, inefficiency, or inattention of counsel - behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer," or the attorney's advice deprived "the defendant of an otherwise available, substantial ground of defense." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). Ordinarily, where the claim is based on the failure to file a motion to suppress, a defendant would also have to demonstrate "a likelihood that he would have prevailed on a motion to suppress. . . ." Commonwealth v. DiPietro, 35 Mass. App. Ct. 638, 640 (1993). Chetwynde suggests, however, that a defendant does not always have to clear this last hurdle.

In Chetwynde, the defendant moved to withdraw his guilty plea because he asserted that his trial attorney had informed him that his motion to suppress his confession had been denied when in fact defense counsel had withdrawn the motion without a hearing. See Chetwynde, 31 Mass. App. Ct. at 12-13. The Court held that this claim, if true, would constitute grounds for withdrawal of the guilty plea. More importantly, the Court stated that the Defendant did not have to establish a reasonable likelihood that he would have prevailed on the motion to suppress his

confession, or that counsel's decision to withdraw the motion could not be characterized as a legitimate "tactical maneuver". Id. at 13-14. "Rather, the crucial issue here is whether the defendant was so misled by counsel's alleged false representations that he prematurely waived his right to a jury trial." Id. at 14. In support of this holding, the Court wrote:

> The confession was the centerpiece of the Commonwealth's case against the defendant. As such, the status of the motion to suppress that confession was of paramount concern to the defendant in deciding whether to plead guilty. This is especially true if we accept, for the sake of discussion, that since defense counsel had advised the defendant that he should not "rock the boat," that he "didn't have a chance" in front of a jury, and that his statement to the police "would convict him in front of just about any jury around." In these circumstances, there can be little doubt that if counsel falsely represented that the motion to suppress had been denied, the defendant reasonably might have thought that any hope he may have had of mounting a successful defense at trial had been foreclosed.

Id. Likewise in this case, Mr. Duclos' confession was the centerpiece of the Commonwealth's case. If defense counsel represented to Mr. Duclos that there was no possible basis for suppressing his confession, Mr. Duclos "reasonably might have thought that any hope he may have had of mounting a successful defense at trial had been foreclosed."

### B. Failure To Describe Element of Malice During Plea Colloquy

During the plea colloquy, the trial judge has an obligation to insure that the defendant understands the elements of the charge to which he is pleading guilty. See Commonwealth v. McGuirk, 376 Mass. 338, 343-44 (1978). I have reviewed the plea colloquy in this case and determined that neither the judge nor counsel ever explicitly explained the element of malice to Mr. Duclos. At fist glance this deficiency raises a possible basis to withdraw the guilty plea. A review of the case law, however, suggests that this claim has no merit.

Massachusetts Court have held that the obligation to insure that the defendant understands the elements of the charge may be satisfied by a representation that counsel has explained to the defendant the elements he admits by his plea or the defendant's statement admitting to facts constituting the unexplained element. See McGuirk, 376 Mass. at 343-44.

In this case, defense counsel represented to the Court that he had explained all of the elements of second degree murder to Mr. Duclos. Counsel then stated, "I'm fully satisfied that I, to the best extent possible, have explained to Mr. Duclos the elements exhaustively." While defense counsel never explicitly stated that he explained the element of malice or put a definition of malice on the record, case law indicates that the Court will take this representation as evidence that he explained the element of malice to Mr. Duclos and that Mr. Duclos understood it. See Commonwealth v. Begin, 394 Mass. 192, 198 (1985).

6

More importantly, the prosecutor read into the record the confession Mr. Duclos gave to the police in the early morning after the killings. The judge asked Mr. Duclos if he made the statement and if it was true. Mr. Duclos answered "yes" to both questions. In a number of other cases where defendants have challenged their 2nd degree murder guilty pleas on the ground that the element of malice was never explained to them, the Court has repeatedly held that the defendant's admission to facts establishing malice - that is, an unexcused intention to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous harm will follow - overcomes any claim that the defendant did not understand the element of malice. See Begin, 394 Mass. at 196-98 (malice supplied by defendant's admission that he fired a rifle at victim); Commonwealth v. Sullivan, 385 Mass. 497 (1982) (failure to explain malice overcome by defendant's admission to killing "unlawfully" and no evidence of excuse or mitigation to manslaughter despite exculpatory responses to colloquy); Commonwealth v. Soffen, 377 Mass. 433, 441 (1979) (defendant's admission to shooting victims repeatedly in the head overcomes his disclaimer of malice aforethought); McGuirk, 376 Mass. at 343-44 (defendant's admission to protracted beating overcomes his disclaimers of malice aforethought)

    C.    Adequacy of Colloquy In Other Respects

I have reviewed the colloquy for other deficiencies and have not found any. The judge advised Mr. Duclos that by pleading guilty he was waiving a number of rights, including the right to a jury trial, the right to confront and cross-examine witnesses, and the privilege against self-incrimination. Mr. Duclos indicated that he understood this. The judge also asked the prosecutor to provide a factual basis for the plea and he did so - specifically, he read Mr. Duclos' confession as well as Mr. Smith's confession. Finally, the judge asked Mr. Duclos whether he was making the plea voluntarily. In connection with this query, the judge asked Mr. Duclos if he had an opportunity to consult with his attorney, whether he was satisfied with the advice of his attorney, and whether his decision to plead guilty was the product of threats or promises. Mr. Duclos indicated that his plea was voluntary, that he was satisfied with the advice of counsel, and that his decision to plead guilty was not the result of threats or promises other than the promise of the prosecution to recommend 2nd degree murder in exchange for Mr. Duclos' testimony in Mr. Smith's trial. The judge also asked how old he was, how much education he had received, and whether he suffered from any mental problems. Mr. Duclos indicated that he was 20 years old, that he had completed the 11th grade, and that he did not suffer from any mental problems.

III.    Conclusion

While I believe the prospects for success are slim, I think Mr. Duclos could make a good faith argument that he should be permitted to withdraw his guilty plea on the grounds that his trial counsel was ineffective in not moving to suppress his confession either because it was procured before he received Miranda warnings or because it was fruit of an illegal warrantless search - that is, the removal of Mr. Duclos' shoes, revealing his blood-stained socks.